[No. 21426. Department Two. September 17, 1929.]

CARSTENS PACKING COMPANY, *Appellant,* v. SWIFT & COMPANY, *Respondent.*[1]

*Kerr, McCord & Ivey* and *Wm. Z. Kerr,* for appellant.

*Palmer, Askren & Brethorst,* for respondent.

MILLARD, J.—This action was commenced to recover for a breach of implied warranty as to the quality of a carload of tallow. The cause was tried to the court, resulting in findings and conclusions favorable to the defendant. From the judgment of dismissal, the plaintiff appeals.

[1]Reported in 280 Pac. 351.

Pursuant to agreement of December 15, 1925, of the parties herein, the respondent, on January 9, 1926, shipped from its Denver, Colorado, plant to the appellant's packing plant in Tacoma, Washington, a tank car of sixty thousand pounds of Denver Government Inspected edible tallow. The memorandum confirming the contract, in so far as material to this appeal, reads as follows:

"ARTICLE Denver G. I. Edible Tallow. QUALIFICATIONS

"Guaranteed equal to sample submitted, our Number 66."

Prior to, and immediately upon the placing of the tallow in the tank car, the tallow was inspected by an inspector of the United States Bureau of Animal Industry, at Denver, who certified it to be edible tallow in a sweet and good condition and fit for the manufacture of cooking compounds for human consumption. Upon arrival in Tacoma, January 17, 1926, the tallow was physically inspected by an inspector of the United States Bureau of Animal Industry. The extent of that inspection was viewing and smelling the tallow. That inspector certified the tallow to be edible tallow fit for use in the manufacture of cooking compounds for human consumption.

Appellant's foreman made a physical and a chemical inspection. The foreman, who was in charge of the manufacture of compounds and lard, and the government inspector detected a slightly rancid odor when inspecting the shipment; however, the appellant accepted the tallow. The foreman's chemical analysis disclosed that the free fatty acid content had increased 1.50 per cent during the period of transportation from Denver to Tacoma.

Two days subsequent to the arrival of the tallow, steam was forced into the tank and a portion of the

tallow was pumped into the rendering plant and made into compound. The next day the tallow was reheated and the remainder of the tallow pumped from the tank car into a storage tank. The tallow remained in the storage tank a week or ten days. The tallow was then reheated in the storage tank and twenty-one thousand pounds pumped into the rendering plant, mixed with the tallow of the appellant and made into compound. The tallow was reheated several times each week as it was from time to time pumped into the rendering plant for manufacture into compound. About February 8, 1926, a sample of the compound made from the mixture of the appellant's and respondent's tallow was taken by the government inspectors and forwarded to San Francisco, where a chemical analysis showed that the tallow was sweet and fit for human consumption.

Witnesses of appellant testified that, shortly after the compound manufactured from the respondent's tallow went out to the trade, complaints came in of the quality of the compound. The appellant then proceeded to dilute the rancidity by using one part of respondent's tallow to three to five parts of the appellant's tallow, in making the compound, until the government inspectors ordered the discontinuance of the use of respondent's tallow. About the middle of March, a chemical analysis of the tallow by the government inspectors resulted in the order for the disposal of the remaining tallow, which was sold to a soap manufacturer at a loss to the appellant of approximately seven hundred dollars.

It was the view of the trial court that the article furnished by the respondent to the appellant was the article agreed to be sold—government inspected edible tallow; that it was edible tallow, when delivered, and the appellant failed to meet the burden of proof resting

upon it to establish that the deterioration subsequent to delivery was due to a latent defect. The pertinent findings of the court are substantially as follows:

The tallow, on its arrival in Tacoma, was subjected to a physical and chemical inspection by the appellant and was accepted as edible tallow and as fully complying with the sample submitted. On arrival in Tacoma, the tallow was edible tallow, a little rancid but in usable condition, and the deterioration was not due to any latent defect in the tallow; and at the time of the execution of the contract for the sale of the tallow, which is a highly perishable product, there was no local or general custom that the tallow should remain sweet, sound and free from rancidity for any period whatever.

Appellant argues that it was bound to accept the tallow. Being usable, while not entirely satisfactory, the tallow complied with the implied warranty of fitness for the appellant's purpose when it arrived in Tacoma; but within two months, although properly handled and stored, it became useless. Sold as government inspected edible tallow by a manufacturer, there was an implied warranty that the tallow was fit for the purpose intended—the manufacture into a product which would be edible and fit for human consumption, and there was also an implied warranty that the tallow was capable of being kept the customary time. There must have been some latent impurity in the tallow or some improper process of manufacture which made this lot of tallow more susceptible to spoilage than edible tallow ordinarily is.

It is clear from the evidence that tallow is a highly perishable product. The existence of any local or general custom that tallow will remain sweet, sound and free from rancidity for any period of time has not been established. One of appellant's witnesses

testified that tallow could be kept from six months to one year under favorable conditions. Appellant's president testified that tallow will keep for a period of two years but that "it is not customary for them to hold tallow two years. As a usual thing they use it as fast as they make it."

Respondent's witnesses testified that, under the most favorable conditions, tallow would only keep for a period of about six months. The inspection of the tallow at Tacoma by appellant's foreman and by a government inspector resulted in the certification of the fact that the tallow was edible and fit for manufacture into cooking compounds for human consumption, the purpose for which the tallow was sold by respondent to appellant. The analysis by government inspectors on February 8, 1926, (one month subsequent to shipment from Denver) of a sample of the compound manufactured from a mixture of appellant's tallow and respondent's tallow, disclosed that the tallow was sweet and fit for human consumption.

■ Appellant has not sustained the burden of proof resting upon it to show that the deterioration subsequent to delivery was due to a latent defect, or that the defect could not have been discovered by ordinary inspection. Every reheating would injure the tallow and increase the acid content which causes rancidity. Improper storage, change of temperature, improperly cleaned containers, and other causes will produce deterioration. Appellant's witnesses testified that the tallow was properly handled after arrival in Tacoma. An expert witness testified for respondent that the manner in which the tallow was handled by the appellant caused its deterioration.

■ Appellant's president stated in his letters to the respondent that the appellant had full knowledge that the tallow was unfit for human consumption and

that appellant had intended to dispose of the rancid tallow unless discovered by the government inspectors; in fact, quite a large quantity of the tallow was sold before its sale was stopped by the inspectors. Whether motivated by self-interest (need of the tallow at the time for manufacture of cooking compounds), or whether prompted by the more laudable motive of protecting the respondent from pecuniary loss, the appellant waived the breach, if any, of the warranty of the quality of the tallow. The letters from appellant's president to the respondent, so far as material, are as follows:

"March 17, 1926—The last tank of edible tallow bought from you and shipped from Denver arriving here January 18 was rancid, but we have been using it, mixing one tierce of your tallow with five of our own in our compound, however, the government inspectors finally sent a sample of this tallow to San Francisco and notice came back today that this tallow is not fit for human food and was condemned. We succeeded in getting away with all but forty-four tierces and thought we could use the rest the way we did, although it made our compound bad. By this you will see that we have done the very best to protect your interest instead of condemning it on arrival and *as long as the government did not condemn it, thought would say nothing about it at the time it arrived, although we knew it was rancid and bad,* but done everything we could to protect your interest and tried to use it. Now that the government finally caught it and stopped us from using it, will have to sell this tallow to the best advantage, therefore writing you this letter and you please write us if we should go ahead and sell it and put in a claim for the amount left over, the difference we sell this tallow for and what we paid for it. Very sorry this has happened, but *it is in exactly the same condition today as the day it arrived,* and had it been sweet would have been used up immediately, but the condition it arrived in we could only use a small amount to every batch of compound.''

"April 6, 1926—The government usually takes a sample of every car of tallow we get in, of which we buy a good many, but this time they did not take a sample till all but forty-four tierces were used. The tallow looks about the same as it did on arrival, but naturally deteriorated a little. *Our lard refiner was telling me at the time when he first opened up the tank the rancid smell that came out of the tank was very bad and the only mistake we made, should have notified you and not accepted it, but thinking we could use it and needing the tallow at the time and to protect your interest, we did not want to say anything, as the government usually tells us quick enough when we cannot use it, but this time they did not take a sample until, later,* which was sent to San Francisco and report came back, 'not fit for human consumption.'"

"May 7, 1926—. . . Very sorry you have decided we should be losers on the balance of the Edible tallow on hand bought from you at Denver when we are the innocent parties. *The handling of the tallow could not be improved upon with regards to the transferring from the tank to tierces and did not hurt the tallow any at all, but the condition of the tallow was just exactly the same on arrival here as it is now* and only wishing to protect your interest *we thought by mixing with our own tallow we could get away with it* and it so happened that the government did not take a sample at the time, which they usually do, but did later."

"June 25, 1926—. . . It was only the good will we showed your company and not wishing to make you any expense or trouble that we tried to use this tallow and made us do as we did, however *when the tallow arrived our lard man and myself carefully talked it over what to do and we concluded if the government did not take a sample of it that we would get by with it, but later on they did take a sample sent it to Frisco and it was condemned for edible purposes.* We should have refused the tallow, as the tallow was in exactly the same condition, the same acid test on arrival as it was the time it was condemned, there was no particle of difference and I hope you will not think different as we are absolutely right about it and had the tallow passed there

would have been nothing said about it, but as they did not take a sample at the time it arrived, but did later on when they found the compound was not what it should be it was then condemned and it is only right that you should make good.'' (Italics ours.)

Having examined the tallow and accepted it, the appellant is concluded by such acceptance, as there is no showing of fraud or express warranty. The acceptance after inspection of an article furnished under a contract for an article of a certain grade precludes the purchaser from denying that the contract was satisfied:

''Where there is no warranty or fraud and the defects are patent, the buyer cannot, by any notice to the seller of the failure of the article delivered to conform to the contract, prevent his acceptance from being a waiver of such noncompliance. The buyer must either accept the article, and thereby become liable to pay the stipulated price, or he can reject and give notice of the nonacceptance, and bring his action, if he so elects, for the nonperformance of the contract; he cannot do both, nor can he accept it and impose conditions and sue the other party for non-compliance with the conditions which he has imposed.'' 23 R. C. L., p. 1439, § 264.

The judgment is right, and it is affirmed.

MITCHELL, C. J., MAIN, FRENCH, and PARKER, JJ., concur.